SILVIO POLITI, Respondent, *v.* IRVMAR REALTY CORP., Defendant-Appellant and Third-Party Plaintiff. MORRIS ROSEN & SONS, INC., Third-Party Defendant-Respondent.

First Department, March 24, 1959.

*Joseph M. Callahan* of counsel (*Eugene J. Morris* and *Robert D. Levin*, with him on the brief; *William J. Tropp,* attorney), for appellant.

*Paul O'Dwyer* of counsel (*Howard N. Meyer* and *Maxwell V. Lovins* with him on the brief; *Strauss & Fitzgerald,* attorneys), for respondent,

*Herbert A. McDevitt* of counsel (*McDevitt, Stricker & Needham,* attorneys), for third-party defendant-respondent.

VALENTE, J. Defendant, Irvmar Realty Corp., appeals from a judgment in favor of plaintiff entered upon a verdict of $100,-000 rendered by a jury. The appeal taken from that part of the judgment which dismissed defendant's third-party complaint against Morris Rosen & Sons, Inc., has been expressly abandoned.

Appellant was the owner and general contractor of a six-story building in the course of construction in The Bronx. Morris Rosen & Sons, Inc. (hereinafter referred to as "Rosen & Sons"), one of approximately 25 various subcontractors on the job, was engaged to do the brick and scaffolding work. Rosen & Sons' subcontract included the installation, the moving, and the maintenance of the scaffolding used by its bricklayers. Among several scaffold men employed by Rosen & Sons were Leonardo Giangrande, the "head man", and Thomas Sherlock.

The superintendent of the general contractor was one David Shiren, whose duties were to supervise the progress and performance of the work and to co-ordinate the operations of the various subcontractors.

On January 28, 1953 [the day of the accident] plaintiff and other bricklayers were at work laying exterior brick at the fourth floor level of the building. They had started to work at 8:00 A.M. About 10:00 A.M., it began to rain, bricklaying work ceased and the crew retired to a shanty. It rained until about 1:00 P.M.

During this lay-off period some of the bricklayers went home. Plaintiff and others remained; and about 1:00 P.M., plaintiff testified, Shiren, the general superintendent, asked plaintiff to do him a "favor" and go and point up the places where the mortar had been washed away because he wanted to move the scaffold to the next floor.

Notwithstanding this alleged conversation with Shiren, plaintiff testified he did not immediately go upstairs to fix the wall, but continued sweeping the shanty until after 1:00 P.M., when De Roberts — an employee of Rosen & Sons and plaintiff's foreman — directed him to go up and do the pointing. It was only after De Roberts gave directions and plaintiff had completed the sweeping that he ascended to the scaffold to do the work. He was working for about 30 to 45 minutes, when Sherlock, a scaffolding man — also an employee of Rosen & Sons — pulled out the cross planking which formed the support for the section of the scaffold upon which the plaintiff was working, causing the scaffold to collapse and the plaintiff to plummet to the ground and sustain the injuries that gave rise to this suit.

The complaint charges that the scaffolding was defective "and in a state of disrepair and improper construction". The bill of particulars reiterates this contention. A further charge — made in the complaint and in the opening statement by plaintiff's counsel to the jury — was that intoxicated laborers were employed to construct the scaffold, that one of the scaffold men, Sherlock, was not too sober, and that Sherlock's inebriated condition was called to Shiren's attention by Giangrande. These latter accusations were not proven at the trial nor was there evidence of any defective condition, disrepair or improper construction of the scaffold.

With the exception of medical experts, the only other witness called by plaintiff at the trial was Giangrande, who testified he had known plaintiff for about 37 years and that his (Giangrande) job was that of directing the scaffold men in the employ of Rosen & Sons. Giangrande also testified to a conversation which he allegedly overheard between Shiren and Sherlock, at about 1:15 P.M., in which Shiren told Sherlock to go and raise the scaffold and move the planks to the next floor above.

With respect to Giangrande's account of that crucial conversation, it should be noted that Giangrande testified it was his job as foreman of the scaffold crew to give orders to Sherlock, and that throughout the course of the job, without exception, it was he who gave the orders when required to raise the scaffold. Moreover, he testified that Shiren had never before given orders of any kind to Sherlock. Additionally, Giangrande made it clear that the scaffold upon which plaintiff was working — and on which Giangrande was standing close by plaintiff at the time of the accident — was a safe and proper scaffold and that the sole cause of the accident was Sherlock's pulling out the cross-planks forming the support for the scaffold.

Both Shiren and Sherlock, when called as witnesses by defendant, denied both the conversations as to directions testified to by plaintiff and Giangrande. Defendant also called De Roberts, the bricklayer foreman for Rosen & Sons, who testified that on the date of the accident, it was he who called plaintiff out of the shanty and directed him to go up to do the pointing of the brick. He further testified that he never heard Shiren give orders to any of the workmen on the job; and in fact, Shiren had no right to give any such orders.

It appears to be agreed — and the testimony establishes — that the accident was caused by Sherlock's removal of a supporting plank of the scaffold, while plaintiff was standing on it, and that the scaffold collapsed as a result of that act. The

serious question is whether the evidence is of sufficient weight to impose liability upon the owner and general contractor for this careless act by plaintiff's co-employee.

Quite obviously plaintiff relies upon *Broderick* v. *Cauldwell-Wingate Co.* (301 N. Y. 182) to resolve that issue in his favor and to sustain the judgment. In that case the court said (p. 187): "At common law, a general contractor is not responsible for the independent negligent act of his subcontractor (*French* v. *Vix,* 143 N. Y. 90; *Hexamer* v. *Webb,* 101 N. Y. 377), and it is true that the mere retention of the power of general supervision to see that the over-all work proceeds properly and to co-ordinate the actions of several subcontractors on the site will not ordinarily cast him in damages for the negligence of any of the latter (*Moore* v. *Charles T. Willis, Inc.,* 250 N. Y. 426; *Ahbol* v. *Harden Contr. Co.,* 265 N. Y. 564). Nor is the general contractor obliged to protect employees of his subcontractors against the negligence of his employer or that of a fellow servant (*Iacono* v. *Frank & Frank Contr. Co.,* 259 N. Y. 377). These common-law rules, as is often the case, yield under the circumstances of a given case where the situation is governed by statute (e.g., Labor Law, § 240), or when the general contractor, by his act or conduct, assumes control and gives specific instructions which necessarily involve the safety of the subcontractors' men (see *Wawrzonek* v. *Central Hudson Gas & Elec. Corp.,* 276 N. Y. 412)."

In *Broderick* the plaintiff was engaged in putting formwork in a bay of a building. When he discovered that certain supports for the bay were absent, he looked for his foreman for instructions before commencing to work. He was unable to locate the foreman but did find the general contractor's superintendent whom he asked whether there were going to be any supports furnished. The superintendent replied: "'There are no shores going in there. Go ahead. It is all right.'" Other witnesses corroborated that conversation. The plaintiff then proceeded to work in the bay, and he received severe injuries when one of the supports broke and he was precipitated 25 to 30 feet to the ground. The Court of Appeals held (p. 188) that the conversation with the general contractor's superintendent "might well, to a jury, have constituted an assurance of safety * * * and, even more important, an assumption of *direct control* over the particular work in progress." Implicit in the verdict for the plaintiff, the Court of Appeals held, was not only a finding that the conversation had occurred but also that "defendant's employee was negligent in giving plaintiff a direction to work

under an assurance of safety when he knew or should have known that a dangerous condition existed ''.

Predicated, as respondent's case is on *Broderick,* we find that the verdict is against the weight of the credible evidence on the essentials necessary to come within the *Broderick* doctrine. As it appears in the record, the conversation between Shiren and plaintiff — if it took place — does not rise to the status of a '' direction '' which plaintiff had little choice but to obey. In fact, plaintiff's version of the colloquy has the aspect of a request for a favor rather than an imperative command. Moreover, it appears that plaintiff did not immediately comply with Shiren's request but continued sweeping the shanty until he was directed by De Roberts, his own (Rosen & Sons) foreman, to ascend to do the pointing, work. Apart from plaintiff's own admission as to this sequence of events, there is De Roberts' testimony to the same effect. Hence, there was overwhelming evidence that plaintiff at the time of the accident was acting under the direction of his employer's foreman.

Additionally, even if plaintiff had ascended the scaffold at Shiren's request, plaintiff did not establish, as was done in *Broderick,* that the scaffold was in a dangerous condition. The testimony, on the contrary, is that the scaffold was at all times a safe and proper one.

If it be the fact that Shiren directed Sherlock to raise the scaffolding — there being no defective condition in the scaffold — the appellant cannot reasonably be charged with a duty to anticipate that Sherlock, plaintiff's fellow employee, would disregard the fact that plaintiff was working on it and proceed to remove the support for the scaffold without notifying him.

The verdict of the jury, which implicitly holds that Shiren instructed Sherlock and that Giangrande heard him is against the weight of the credible evidence. (See *Bottalico* v. *City of New York,* 281 App. Div. 339, 341.) Apart from the fact that the testimony is uncorroborated and further that the alleged instructions from Shiren were equivocal, the testimony taxes credulity in other respects. The evidence points to the fact that the scaffold crew at all other times went about their work raising the scaffolds without specific instructions. No plausible reason was offered why Shiren would suddenly have directed Sherlock to do this detail of the work, particularly when, as Giangrande testified, throughout the course of the job it was he who always gave the orders to raise the scaffold and that he had never before heard Shiren give an order to Sherlock. Again, it is difficult to believe that although Giangrande heard Shiren direct Sher-

lock to dismantle the scaffold, and went up to the scaffold with Sherlock, he would not have warned the plaintiff, who was standing only a few feet away from him, of what was going to take place.

This court must look with a great deal of skepticism upon the uncorroborated assertions of the two conversations supposedly had with Shiren, where, as here, the history of the job shows noninterference of the general contractor and owner as to the detail work of the subcontractors. It is too incredible a coincidence to find that the only time Giangrande heard the general contractor's superintendent direct Sherlock to do a minute item of the work a workman was injured. There should be more convincing evidence to bring a general contractor or owner within the ambit of liability and to overcome the established law as to liability for injuries to employees of subcontractors. In any event, the credible evidence in the instant case was not of sufficient weight to meet the standards for imposing liability found in *Broderick* v. *Cauldwell-Wingate Co.* (*supra*).

The judgment in favor of plaintiff should be reversed on the facts and in the exercise of discretion, and a new trial granted, with costs to appellant to abide the event.

BOTEIN, P. J., BREITEL, McNALLY and BASTOW, JJ., concur.

Judgment unanimously reversed insofar as it awards judgment in favor of the plaintiff and against defendant, Irvmar Realty Corp., upon the facts and in the exercise of discretion, and a new trial ordered, with costs to the appellant to abide the event, and said judgment affirmed insofar as it awards judgment in favor of the third-party defendant-respondent dismissing the third-party complaint, with costs.