**Powell v New York City Tr. Auth.**

2025 NY Slip Op 32023(U)

June 6, 2025

Supreme Court, Kings County

Docket Number: Index No. 505814/2019

Judge: Heela D. Capell

Cases posted with a "30000" identifier, i.e., 2013 NY Slip Op 30001(U), are republished from various New York State and local government sources, including the New York State Unified Court System's eCourts Service.

This opinion is uncorrected and not selected for official publication.

At an IAS Term, Part 19 of the Supreme Court of the State of New York, held in and for the County of Kings, at the Courthouse, at 360 Adams Street, Brooklyn, New York, on the 6 day of June, 2025.

P R E S E N T:

HON. HEELA D. CAPELL,
                              Justice.
-------------------------------------------------------------------X
LAMONT POWELL,

                                    Plaintiff,

                -against-                                            Index No.: 505814/2019
                                                                    Motion Sequence: 5

NEW YORK CITY TRANSIT AUTHORITY,

                                                                    Decision & Order

                                    Defendant.
-------------------------------------------------------------------X

| The following e-filed papers read herein: | NYSCEF Doc Nos.: |
|---|---|
| Notice of Motion, Affirmations, and Exhibits Annexed | 97-117 |
| Affirmations in Opposition and Exhibits Annexed | 121-134 |
| Reply Affirmations and Exhibits Annexed | 137 |

In this action to recover damages for personal injuries, a bifurcated trial resulted in a liability verdict in favor of Lamont Powell ("Plaintiff"), wherein a jury found defendants 85% at fault and Plaintiff 15%, comparatively, at fault. The damages portion of the trial resulted in an award totaling $90 million in favor of Plaintiff, broken down as follows: $27 million for past pain and suffering for a period of 6 years and 4 months (approx. $4,285,714.20 per year); $50 million for future pain and suffering for a life expectancy of 25.4 years (approx. $1,968,503.90 per year); and $13 million for future medical expenses. Defendant,[1] New York City Transit Authority ("NYCTA") now seeks an order to set aside the damages verdict, pursuant to CPLR 4404 (a) and 5501(c), alleging the award is

---

[1] The parties had previously stipulated to remove Metropolitan Transit Authority ("MTA") from the caption and the caption is hereby amended nunc pro tunc to reflect the change.

[* 1]

excessive, speculative, and otherwise unsupported by the record. Plaintiff opposes. Defendant does not contest the liability verdict.

## Background

On June 30, 2018, at approximately 1:30 am, Plaintiff, age 50 at the time, was struck by a train at the Broadway Junction subway station on the Manhattan bound track of the "L" train. As a result of this occurrence, Plaintiff suffered a left hip disarticulation, a trans humeral amputation of the left arm, and a comminuted transverse tibial shaft and fibular shaft fracture of the right leg. Plaintiff subsequently brought the instant action against defendants which resulted in a bifurcated trial. The liability portion of trial concluded on May 17, 2024, and the damages portion of trial concluded on September 30, 2024. Plaintiff was 56 at the time of the jury verdicts.

### *Testimony*

### For the Plaintiff

During the subject damages trial, Plaintiff called two medical professionals to testify: Thomas Hamilton Gouge, M.D. ("Dr. Gouge"), a retired trauma surgeon, and Christopher Kyriakides, M.D. ("Dr. Kyriakides"), a physiatrist. Plaintiff also called on economist, Kristen Kucsma, to testify regarding special damages and inflation.

### Mr. Powell's Testimony

Prior to the accident, Plaintiff testified that he lived with a roommate and worked off-the-books in security, construction, selling goods wholesale, and cutting hair. Plaintiff had previously undergone surgery for a bleeding ulcer and surgery on his feet to treat injuries from stepping on glass. Plaintiff also used a cane for about a year in 2013 or 2014 for injuries to his lower back and right leg from a slip and fall. In 2016, Plaintiff used a

2

[* 2]

cane for about a year and a half for injuries to his back and his right leg after he fell between two cars on a train. Plaintiff testified that he was not using a cane in 2018, the year of the subject accident, and denied any pain with his left arm or left leg. Plaintiff further testified that he regularly did calisthenics, pull-ups, dips, push-ups, jogged, cycled, and fished. Plaintiff admitted to drinking alcohol every other day, prior to the accident, for at least 10 years, and that he smoked cigarettes. Plaintiff testified that in the past, he had been in drug abuse programs and was enrolled in one at the time of the subject accident. Plaintiff also testified that he has been on disability since 1991 or 1992 for paranoia, schizophrenia, and depression and that he is a recipient of Medicaid. Plaintiff further testified that he is left hand dominant, and that on the day of the accident he was playing full court basketball with his friends for four to five hours.

After the subject accident, Plaintiff claims post-traumatic stress disorder, stump pain, phantom pain, and cosmetic scarring. Plaintiff testified that he was admitted to Brookdale Hospital until August 2, 2018, after which time he went to Lawrence Nursing Home, staying for approximately 15 months, until November of 2019. While at Lawrence Rehabilitation Center, Plaintiff underwent physical therapy, learning how to roll over in bed, transfer, and walk. It was noted that Plaintiff at the time was incontinent of bowel and bladder and required a Hoyer lift to be transferred from his bed to his wheelchair. After his cast was removed from his right leg, Plaintiff could not bend his leg straight and underwent manipulation procedures to improve his range of motion. Thereafter he went to the Belle Harbor community, a supportive housing development, where he presently resides.

Mr. Powell testified that he is constantly in pain but stopped taking his pain medication because of side effects, including dizziness, light-headedness, and stomach

3

issues. Further, the medication did nothing to eliminate his pain. Plaintiff maintains he continues to smoke one half pack or less of cigarettes per day and regularly smokes marijuana to help with the pain and to aid his sleep. Plaintiff uses an aide to shop for food, help him dress, and help him into the bathroom, where he must use a shower chair and bar to bathe. He uses a manual wheelchair and is dependent on Access-A-Ride for transportation. Plaintiff testified that he does not use the prosthetic leg, provided to him, as it is very heavy and difficult to wield. He further testified that there regularly is blood inside his prosthetic leg from the irritation it caused him. Plaintiff's prosthetic arm is made of plastic and the fingers do not move. Plaintiff testified he cannot write or even open a can of tuna and demonstrated how he cannot fully raise his left arm. Plaintiff also testified he stopped going to physical therapy during the COVID pandemic due to the pandemic's restrictions.

Dr. Gouge's Testimony

In his direct examination, Dr. Gouge testified as to the operative procedures Plaintiff underwent during his admission to Brookdale Hospital, during the period from June 30, 2018, through August 2, 2018. However, he himself did not perform a physical examination of Plaintiff. The ambulance call reports indicate that at the time Plaintiff was freed from the train, he was awake and able to respond to questions but was not fully alert mentally as a result of his injury. Emergency responders noted that Plaintiff had a near complete amputation of both his left arm and his left leg below the hip joint. He also had a scalp laceration and evidence that he had a fracture of his right leg as well. Dr. Gouge testified that as a result of his injury, Plaintiff would have lost significant amounts of blood resulting in low blood pressure and that the on-site treatment began with intravenous fluids

4

[* 4]

to stabilize Plaintiff and prevent him from going into shock. Once in the emergency room, Plaintiff continued to received blood transfusions and was intubated while responders triaged his injuries. Plaintiff underwent "damage control surgery" to address injuries which were immediately fatal, including the clamping of open blood vessels. Dr. Gouge testified that Plaintiff's injury was more akin to a military injury rather than a civilian injury and that Plaintiff's amputation was done with significant damage to the surrounding tissues in an unsterile environment, requiring a staged approach.

With regard to Plaintiff's left leg, Dr. Gouge testified that Plaintiff's skin and muscles were torn apart, and the bones were crushed and cut across. As a result, Plaintiff no longer had a nerve supply or a blood supply to the lower part of his leg, rendering his left leg "devascularized." Plaintiff's injuries were reinspected several times, for irrigation to remove dirt and grime, for closure of blood vessels, and for removal of any dead muscle or tissue. A suction-vac was used to pull fluid away to further remove bacteria. Eventually there was so little remaining of the hip bone, the decision was made that the only way to treat Plaintiff's left leg was to take out the femur - - the entire leg bone up to the hip joint. Dr. Gouge testified that the hip is a ball and socket joint that allows for stability and weight bearing. Plaintiff's amputation included removal of the ball but not the socket.

In regard to the Plaintiff's left arm, he was left with a transection or division of the bone in the upper arm just below the shoulder joint. This would have disrupted all the muscles going down to the elbow and to the lower arm, torn off the skin and damaged the blood vessels supplying the entire area below the injury. The main blood vessel coming out of the chest down into the arm would have been torn off in that area and, upon arrival at the hospital, the only thing keeping the left forearm connected to the upper arm were a

5

few skin bridges and a few large nerves. The left arm was prepared for an eventual amputation in the same manner as the left leg.

As for Plaintiff's right leg, the skin was not opened and was considered a closed fracture. Dr. Gouge testified that a closed fracture would require a temporary approach where an external fixation and pins are placed, allowing for manipulation of the bones into their normal anatomic position, stabilizing them so they could heal by themselves. Once the bones were in alignment, the pins were removed, and Plaintiff's leg was then placed in a plaster cast. Dr. Gouge testified that this level of trauma creates additional risks including thrombosis, where clots develop in the veins that can eventually cause a pulmonary embolism to the heart. Other risks include development of further pulmonary complications or late infections in the leg, which could lead to bleeding and further complications.

Dr. Gouge defined stump pain as pain actually in the residual limb, and phantom pain as pain from body parts that are no longer present. Phantom pain occurs because the brain thinks the missing limb still exists and registers impulses that it interprets as pain. Both stump pain and phantom pain are the result of trauma to the nerves. Dr. Gouge opined that the injuries to Plaintiff's left arm and left leg are permanent in nature and the treatment he received was the result of the injuries from subject incident. Dr. Gouge further opined that despite Plaintiff's injuries, Plaintiff has a normal life expectancy, as lab studies did not demonstrate any deficiency or injury to his organs.

Dr. Kyriakides's Testimony

Dr. Kyriakides testified that physiatry is a combination of orthopedics, neurology, and physical therapy, the goal of which is to determine what is wrong with the function of

6

[* 6]

the body and determine ways to help correct it. Dr. Kyriakides described that patients seeking to use prosthetic limbs need to have them custom fitted and must be trained to use them. Further, Dr. Kyriakides testified to the importance of a patient's eagerness and willingness and how it affects the success of physical therapy. Plaintiff was noted as having a high level of motivation during physical therapy and was eager to use his prostheses. Dr. Kyriakides examined Plaintiff on October 4, 2023 and designed a life care plan based on Plaintiff's needs and desired outcome.

In regard to Plaintiff's current prosthetic leg, Dr. Kyriakides testified that it was incredibly heavy and considered a "filler" -- a prothesis you can only move by shifting -- and that there were better prosthetics available for Plaintiff. He further testified that not having the hip joint makes walking exceedingly difficult and increases the use of energy by 500 percent. He also testified that the blood in the prosthetic leg is the result of Plaintiff's entire body weight sitting on the prothesis, causing a breakdown of the contacting skin, resulting in the bleeding. If the bleeding is not stopped, a pressure ulcer could develop and become infected.

Turning to Plaintiff's left arm, Dr. Kyriakides testified that Plaintiff's current prosthetic is cosmetic, and that Plaintiff's stump was sturdy enough to warrant a better prosthetic. He further testified that Plaintiff had good neurologic function, and his residual limb had movement, making him a good candidate for a myoelectric arm. [2]

---

[2] A myoelectric arm is a prosthesis whose movement plaintiff could control and use to perform various tasks.

Regarding Plaintiff's right leg, Dr. Kyriakides testified that movement was limited with regard to flexion and extension in the right knee. Plaintiff had already undergone manipulation treatment to improve motion range, however, his right knee still has a flexion of 95 degrees when it should be 140 to 160. Dr. Kyriakides testified that there was laxity in Plaintiff's right ankle and atrophy in the extremity.

Dr. Kyriakides stated that the life care plan he prepared lays out the key things required for Plaintiff to live as independently and comfortably as possible. A summary of the recommended items and associated costs are listed as follows:

1. Physical Therapy, 3 times per week for life at $175.00 per session;

2. Left Lower Extremity Hip Disarticulation Prosthesis, 7 total for life at $150,000;

3. Left Upper Extremity Myoelectric Prosthesis, 4 total for life at $250,000;

4. Inpatient Rehabilitation Program, 1 month for a total cost of $300,000;

5. MRI/CAT Scan (Right Knee), for the next 10 years at $5,000.00 each;

6. MRI/CAT Scan (Right Ankle), for the next 10 years at $5,000.00 each;

7. Bone Marrow Aspirate Concentrates (Right Knee and Right Ankle) at $8,000.00;

8. MRI (Spine) at $2,500.00;

9. Medications at $500.00 per month, for life;

10. Psychiatric Therapy/Psychotherapy at $300.00 per month, for life;

11. Dressing Changes for Prosthesis at $2,000.00 per year, for life;;

12. Modified Van (hand controlled) at $175,000.00;

13. Apartment House Living and Modification at $250,000.00 ;

14. Wound Care at $3,000.00;

15. Occupational Therapy at $365.00 per treatment, 100 treatments;

8

[* 8]

16. Physiatrist/Orthopedic Surgeon/Pain Management at $2,000.00 per visit, 1-2 visits per year, for life;

17. Home Health Aide at $70,000.00 per year, 2-3 attendants, 8 hours per day, for life.

Kristen Kucsma's Testimony

Economist, Kristen Kucsma, testified that she used Dr. Kyriakides life care plan report, exclusively, with regard to what treatment or services Plaintiff requires, as she has no expertise in determining an individual's medical treatment. She testified as to the growth rates for the medical expenses set forth in the life care plan and to what the costs for these treatments will be when projected into the future. She concludes that based upon her projections as to future increases, the total sum of Plaintiff's future medical expenses over his lifetime will be $12,674,697.

**For the Defense**

Defendants called Malcolm Reid ("Dr. Reid") a physiatrist, Richard Conceiacao, a prosthetist, and Andrew Bazos ("Dr. Bazos"), an orthopedist to testify. Each expert testified to their qualifications and opinions regarding Plaintiff's injuries. None of defendants' witnesses offered an alternative life care plan or any detail regarding the future care of Plaintiff's injuries.

Dr. Reid's Testimony

Dr. Reid testified that he performed an examination of Plaintiff on February 7, 2020, the results of which revealed that Plaintiff had undergone a left hip disarticulation amputation and left above-elbow amputation, impaired range of motion of the right lower extremity and left upper extremity. Plaintiff's range of motion in his left upper extremity was 90 degrees as opposed to 180 degrees, half the normal range. Dr. Reid further testified

9

[* 9]

that Plaintiff was quite active, and that Plaintiff's goal was to be a community ambulator -- someone who walks outside beyond his or her home. Dr. Reid testified that it was unlikely that Plaintiff could become a community ambulator with his current prothesis. Further, that Plaintiff's injuries prevent him from walking independently, from tying his shoes, and from unbuttoning or buttoning a shirt. Dr. Reid acknowledged that Plaintiff suffered a right knee contracture, stiffness, decreased range of motion as a result of the subject accident and that Plaintiff complained of stump pain and phantom pain.

Mr. Conceiacao's testimony

Mr. Conceiacao testified that hip disarticulations are extremely rare and that generally one would want a hip disarticulation prothesis to be as light as possible for it to remain functional for the particular individual. Mr. Conceiacao also testified to the importance of a patient's motivation to using a prothesis. On cross-examination, Mr. Conceiacao opined that he did not believe Plaintiff would be able to walk normally or walk long distances. Further, Plaintiff would more than likely require a wheelchair for anything other than short distances regardless of the type of prosthetic with which he was fitted. Mr. Conceiacao did not examine Plaintiff.

Dr. Bazos's testimony

Dr. Bazos examined Plaintiff in 2020 and reviewed his medical records. He testified that Plaintiff was unable to fully straighten his right leg and Plaintiff's left upper extremity also had a diminished range of motion. Dr. Bazos testified that Plaintiff's left arm was mangled and unable to be saved or repaired and that, according to the medical records, Plaintiff was aware of his pain while at Brookdale Hospital.

10

As mentioned above, at the conclusion of the damages portion of the trial, the jury found in favor of the Plaintiff an awarded the total sum of $90 million, broken down as follows: $27 million for past pain and suffering for a period of 6 years and 4 months (approx. $4,285,714.20 per year); $50 million for future pain and suffering for a life expectancy of 25.4 years (approx. $1,968,503.90 per year); and $13 million for future medical expenses.

### Discussion

CPLR 4404 permits a court to set aside a jury verdict "and direct that judgment be entered in favor of a party entitled to judgment as a matter of law or it may order a new trial of a cause of action or separable issue where the verdict is contrary to the weight of the evidence." In personal injury cases, the amount of damages awarded to a plaintiff "is a question for the jury, and its determination will not be disturbed unless the award deviates materially from what would be reasonable compensation" (*Wynter v Transdev Services, Inc.*, 207 AD3d 785, 787 [2d Dept 2022]; CPLR 5501[c]).

In determining what is a reasonable award, courts acknowledge, "there can be no fixed basis, table, standard or mathematical rule which will serve as an accurate index and guide to the establishment of damage awards for personal injuries. And it is equally plain that there is no measure by which the amount of pain and suffering endured by a particular human can be calculated" (*Braun v Ahmed*, 127 AD2d 418, 424 [2d Dept 1987]). "Since the inherently subjective nature of noneconomic awards cannot produce mathematically precise results, the "reasonableness" of compensation must be measured against the relevant precedent of comparable cases" (*Turuseta v Wyassup-Laurel Glen Corp.*, 91 AD3d 632, 634 [2d Dept 2012]). "Although prior damage awards in cases involving similar

11

[* 11]

injuries are not binding upon the courts, they guide and enlighten them with respect to determining whether a verdict in a given case constitutes reasonable compensation" (*Peterson v M.T.A.*, 155 AD3d 795, 798 [2d Dept 2017]). "Awards of damages for past and future medical expenses must be supported by competent evidence which establishes the need for, and the cost of, medical care" (*Starkman v City of Long Beach*, 148 AD3d 1070, 1072 [2d Dept 2017]). "Evidence submitted at trial that the plaintiff will incur medical expenses when and if future conditions develop that require treatment is speculative, and does not support an award of damages for future medical expenses" (*Masmalaj v New York City Economic Dev. Corp.*, 197 AD3d 1294, 1296-97 [2d Dept 2021]). Life care plans, which set forth plaintiffs requested and necessary medical expenses in the future, support an award of future medical expenses (*see Yu v New York City Health and Hospitals Corp.*, 191 AD3d 1040 [2d Dept 2021]). Courts also take into consideration "other factors, such as the nature and extent of the injuries" (*see Fortune v New York City Hous. Auth.*, 201 AD3d 705, 707 [2d Dept 2022]).

Here, the evidence at trial established, inter alia, that, as a result of the accident on June 30, 2018, Plaintiff suffered from (1) a left hip disarticulation amputation, (2) an above the elbow amputation on his dominant arm, (3) a fractured tibia/fibula, (4) that Plaintiff experienced, and continues to experience, pain as a result of these injuries, and (5) that his ability to walk and participate in daily activities has been impaired for life.

### *Left Hip Disarticulation and Fractured Tibia/Fibula*

Plaintiff suffered a left hip disarticulation where Plaintiff's entire leg bone up to the hip joint was removed. Testimony established this was an extremely rare occurrence, and while not exactly the same injury, the guiding case law includes parties whose injuries

12

resulted in above-the-knee amputations. As Plaintiff also suffered from a comminuted tibia/fibula and evidence established Plaintiff's right knee had limited flexion, a laxity in his right ankle, and atrophy in the extremity, case law involving loss of use of both legs/lower extremities are also relevant.

Where a 45-year-old plaintiff was struck by a bus and suffered an above the knee amputation of the left leg and whose right leg was, in the words of the court "rendered, essentially useless," a total past and future pain and suffering award of $10 million was approved (*see Aguilar v New York City Transit Authority*, 81 AD3d 509 [1st Dept 2011]). Plaintiff received $5 million for past pain and suffering over a time period of 3.7 years (approx. $1,351,351.35 per year; CPI value today $1,962,378.18)[3] and $5 million for future pain and suffering for a life expectancy of 32.6 years (approx. $153,374.23 per year; CPI value today $222,723.90) (*id.*).

A $5 million verdict for future pain and suffering was approved where a plaintiff underwent an above the knee amputation of one leg and deterioration of the other leg with a life expectancy of 42 years (*see Sladick v Hudson General Corp.*, 226 AD2d 263 [1st Dept 1996] [approx. $120,000 per year; CPI value today $250,000]).

In a case involving a plaintiff who had undergone 6 surgeries ultimately resulting in a bilateral below-the-knee amputation, the jury award of $2,500,000 for past pain and suffering over 4.5 years (approx. $625,000 per year; CPI value today $1,256,281.43) and

---

[3] These values, and those proceeding, were ascertained using the relevant case law awards and the U.S. Bureau of Labor Statistics CPI Inflation Calculator which uses the Consumer Price Index, a measure of the average change over time in the prices paid by urban consumers for a market basket of consumer goods and services, to calculate inflation value.
<https://www.bls.gov/data/inflation_calculator.htm?pubDate=20250409>

13

[* 13]

$4,000,000 over 25 years (approx. $160,000.00 per year; CPI value today $321,608.05) was deemed reasonable (*see John v City of New York*, 235 A.D.2d 210 [1st Dept 1997]). The court considered "the constant pain plaintiff did and will continue to suffer; the four years of physical and mental rehabilitation for which plaintiff was hospitalized; the future psychiatric treatment plaintiff will require; the back and hip pain plaintiff will suffer as a result of using the prosthetic devices; and the inability to return to his former employment or recreations" (*id.*).

In a personal injury action against the New York City Transit Authority arising from the defendant dropping a railroad tie from elevated track that struck a bicyclist on the back and left him permanently paralyzed below the T7 vertebrae level, the court held that damages for past pain and suffering in the amount of $4 million, and future pain and suffering in the amount of $12 million were reasonable (*see Liciaga v New York City Tr. Auth.*, 231 AD3d 250 [2d Dept 2024]). The court had considered the extent and nature of the injuries.

In *Hernandez v Ten Ten Co.*, (102 AD3d 431 [1st Dept 2013]), plaintiff sustained fractures to his tibia and fibula, underwent leg surgery entailing installation of a metal rod and screws in his leg, sustained back injuries, and suffered from reflex sympathetic dystrophy, complex regional pain syndrome, depression, sleep disorder and sexual dysfunction. The court held that the damages verdict of $1 million for past pain and suffering over eight years ($125,000 per year; CPI value today $189,382.58) and $2.166 million for future pain and suffering over 25.8 years was sustainable (approx. $84,000 per year; CPI value today $127,265.09) (*id.*).

14

[* 14]

In *Hernandez v New York City Tr. Auth.*, (52 AD3d 367 [1st Dept 2008]), plaintiff was hospitalized for almost three months, underwent five operations, and will need at least one future operation, requires a cane to ambulate, requires a home health aide and handicapped-adopted housing. The award for past and future pain and suffering of $5.5 million was sustained (*id.*).

### Loss of Use of Dominant Hand/Arm / Transhumeral Amputation

Plaintiff here also required an above-the-elbow amputation of his left arm, his dominant arm. In *Ubiles v Rosenzweig Lumber Corp.*, (225 AD2d 468 [1st Dept. 1996]) plaintiff "suffered a substantial permanent partial loss of the use of his dominant hand and arm, impairing his ability to pursue his occupation." The jury verdict of $1,522,900 was deemed reasonable and not excessive (CPI value today $3,154,286.90). The breakdown of the award, the timeline involved, and the facts regarding how the injury occurred are not specified in the court's opinion.

A jury verdict awarding damages in the amount of $1.8 million for past and future pain and suffering was found not to deviate materially from what would be reasonable compensation where a plaintiff suffered a complex laceration of the right forearm requiring stage closure with a skin graft harvested from his right thigh and "resulted in significant and permanent scarring to his right forearm and thigh, ongoing and permanent weakness in his dominant right hand, less than full mobility in his dominant right wrist, and deficits related to the graft's adherence to muscle and lack of sebaceous and sweat glands" (*see Rojas v New York City Tr. Auth.*, 176 AD3d 990, 991-92 [2d Dept 2019] [CPI value today $2,286,892.16]). Notably, the plaintiff was hospitalized for two weeks, needed temporary assistance with daily activities, and subsequently returned to work as a mechanic

15

approximately two months after the accident but still needed assistance lifting heavy objects and had trouble working with his fingers and his hand in tight spots (*id.*).

In another case where plaintiff suffered severe injuries after she was struck by a van, including an amputation of her right arm above-the-elbow, but was able to return to work, the court determined that "damages above $2,000,000 are excessive" (*see Flynn v Faria*, 139 Misc 2d 699, 705 (Sup Ct, New York County 1988) [CPI value today $5,528,072.60]).

Furthermore, where the plaintiff received an amputation-above-the knee, an award of $3.6 million future pain and suffering for a life expectancy of 18 years was reasonable (approx. $200,000 per year; CPI value today $380,088 per year) (*Hoenig v. Shyed*, 284 AD2d 225 [1st Dept 2001]).

### *Life care plan/Future Medical Expenses*

Plaintiff's expert economist concluded that Plaintiff's future medical costs would total $12,674,697 based on Plaintiff's life care plan. Defendant argues that the jury verdict of $13 million is excessive on the face value because it is $325,303 more than the expert's projected costs. Defendant also argues that Dr. Kyriakides's testimony regarding the proposed life care plan was speculative, however, NYCTA failed to offer an alternative care plan, thus, Dr. Kyriakides's plan remains uncontroverted. While defense expert Mr. Conceiacao testified that there are cheaper knee alternatives than the one presented by Plaintiff, there was no testimony regarding the actual cost of these alternatives or the amount of knee replacements required for Plaintiff's lifetime. Moreover, defense expert Dr. Reid testified, on cross examination, that Plaintiff cannot button his shirt or tie his shoes, that his walking ability has been permanently impaired, and that he complains of

16

[* 16]

both stump and phantom pain. Plaintiff's claim, however, that the jury verdict for future medical costs of $13 million could account for 3 home health aides is speculative, particularly since it is unclear how the jury would calculate future inflation rates as Plaintiff's expert economist did.

## Conclusion

Accordingly, under the circumstances presented and relevant case law, the award for past pain and suffering in the amount of $27 million for a period of 6 years and 4 months (approx. $4,285,714.20 per year); $50 million for future pain and suffering for a life expectancy of 25.4 years (approx. $1,968,503.90 per year); deviate materially from what is reasonable compensation, and the $13 million award for medical expenses is not supported by the evidence.

Therefore, it is hereby,

**ORDERED,** that NYCTA's post-trial motion seeking to set aside the award of damages for past and future pain and suffering and for a new trial is granted on those elements of damages only, unless Plaintiff stipulates within 30 days of service of a copy of the order of this court with notice of entry, to reduce the award for past pain and suffering to $16 million for a period of 6 years and 4 months (approximately $2,539,682.50 million per year), and for future pain and suffering to $10 million for a life expectancy of 25.4 years (approximately $393,700.78 per year), in which event the judgment shall be so modified and, as modified, the judgment shall be affirmed, without costs; and it is further

17

[* 17]

**ORDERED**, that the award for future medical expenses shall be reduced to $12,674,697, in accordance with the evidence submitted.

The court, having considered the parties' remaining contentions, if any, finds them unavailing. All relief not expressly granted herein has been considered and is denied.

The foregoing constitutes the decision and order of the court.

E N T E R

J.S.C.

HON. HEELA D. CAPELL, J.S.C.

18

[* 18]